UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| DALE HENDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:11-cv-00015-JAW |
| | ) | |
| LASER SPINE INSTITUTE LLC, et al., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, CHANGE OF VENUE AND ON MOTION TO DISMISS FOR FAILURE TO COMPLY WITH FLORIDA MEDICAL MALPRACTICE STATUTES OR THE MAINE HEALTH SECURITY ACT**

In 2008, Dale Henderson flew to Florida for expensive back surgery at the Tampa facility of the Laser Spine Institute, hoping for recovery and reimbursement. He got neither. In 2010, Mr. Henderson filed a nine-count complaint against the Laser Spine Institute and Stefan Prada, the surgeon. The Defendants moved to dismiss for lack of personal jurisdiction, for improper venue (and alternatively for a transfer of venue), for failure to comply with Florida medical malpractice statutes, and for failure to comply with the pre-litigation notice and screening requirements of the Maine Health Security Act.

The Court concludes that personal jurisdiction exists over the Defendants, that venue is proper in the District of Maine, and that the Florida statute of limitations is not applicable. However, the Court also concludes that the Plaintiff must first comply with the pre-litigation requirements of the Maine Health Security

Act. Although the Court denies most of the motion to dismiss, it dismisses without prejudice the part of the motion that is based on the failure of the Plaintiff to comply with the Maine Health Security Act and stays the action to allow the Plaintiff to comply with the pre-litigation screening requirements of Maine law.

## I.   STATEMENT OF FACTS

### A.   Procedural History

On December 2, 2010, Dale Henderson, a resident of Orrington, Maine, filed suit in Penobscot County Superior Court against Laser Spine Institute (LSI), a Florida limited liability company, and Dr. Stefan Prada, a Florida resident (collectively Defendants), in connection with medical treatment Mr. Henderson received from them. Mr. Henderson alleged fraud (Count I), breach of contract (Count II), unjust enrichment (Count III), unfair trade practices (Count IV), fraudulent concealment (Count V), negligent misrepresentation (Count VI), negligence (Count VII), intentional infliction of emotional distress (Count VIII), and negligent infliction of emotional distress (Count IX). *Compl.* (Docket # 2). The Defendants removed the action to this Court on January 13, 2011. *Notice of Removal* (Docket # 1).

On January 24, 2011, the Defendants moved to dismiss for lack of personal jurisdiction and for change of venue, or alternatively, to dismiss the action for failure to comply with Florida's medical malpractice statute or the Maine Health Security Act (MHSA), 24 M.R.S. § 2501, *et seq. Defs.' Mot. to Dismiss for Lack of Pers. Jurisdiction and for Change of Venue, or, in the Alternative, to Dismiss for Pl.'s Failure to Comply with Fla. Med. Malpractice Statutes or the Me. Health Sec. Act*

(Docket # 12) (*Defs.' Mot.*).[1]   On February 18, 2011, the Plaintiff objected.  *Pl. Dale Henderson's Opp'n to Defs.' Mot. to Dismiss Compl. for Lack of Pers. Jurisdiction and for Change of Venue, or in the Alternative to Dismiss for Failure to Comply with Fla. Med. Malpractice Statutes or Me. Health Sec. Act* (Docket # 16) (*Pl.'s Opp'n*). On March 4, 2011, the Defendants replied.  *Defs.' Reply in Support of its Mot. to Dismiss* (Docket # 17) (*Defs.' Reply*).

### B.   Factual Background[2]

In September 2008, Dale Henderson, through his personal assistant, Judy Sawyer, contacted LSI, a limited liability company that provides spinal surgery services based in Tampa, Florida, seeking relief from chronic and nearly unendurable back pain.  *Pl.'s Opp'n* Attach. 1 ¶¶ 3, 8 (*Henderson Decl.*); *Pl.'s Opp'n* Attach. 2 ¶¶ 5-7 (*Sawyer Decl.*); *Compl.* ¶¶ 1-2; *Defs.' Mot.* Attach. 1 ¶ 4 (*Bollinger Decl.*).  LSI instructed Ms. Sawyer to forward Mr. Henderson's MRI records to their facilities for review.  *Sawyer Decl.* ¶ 7.  Ms. Sawyer sent the MRIs.  *Id.*  Time passed and LSI did not get back to Mr. Henderson regarding potential treatment.  *Id.* ¶ 8.  Ms. Sawyer then contacted Richard "Bud" Anderson, an Ellsworth, Maine resident, who had initially recommended LSI to Mr. Henderson.  *Id.*; *Henderson Decl.* ¶¶ 5-6, 10.  Mr. Anderson contacted LSI on Mr. Henderson's behalf to inquire as to the status of Mr. Henderson's request for a consultation.  *Henderson Decl.* ¶ 11.

---

[1] The Court cites the Defendants' original and now sealed January 24, 2011 Motion, at Docket # 12; a redacted version of the Motion, filed January 28, 2011, is available at Docket # 15.

[2] The Court recites these facts in accordance with the "prima facie evidentiary standard."  *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 8 (1st Cir. 2009).

Later that month, LSI telephoned Mr. Henderson in Maine to schedule an appointment and discuss the costs of treatment. *Id.* ¶ 12. Mr. Henderson asserts that during that conversation, "Audrey," an LSI employee, assured him that his insurance would cover the treatment costs but informed him that he would have to pay $30,000 in advance. *Id.* ¶¶ 12-13. LSI sent a facsimile to Mr. Henderson, providing him with a list of hotels where he could stay while in Tampa, Florida for his treatment. *Id.* ¶ 14. LSI also faxed Mr. Henderson a patient registration package comprised of several forms for him to fill out and send back to LSI. *Id.* ¶ 15.

In early October 2008, Mr. Henderson traveled to Florida for treatment at LSI. *Id.* ¶ 17. On October 6, 2008, Mr. Henderson received a consultation at LSI and surgery was scheduled for the following day. *Id.* During the consultation, LSI informed Mr. Henderson that, in order for the first treatment to be effective, he would need a second treatment several days after the first. *Id.* The second treatment required a $25,500 advance. *Id.* ¶ 18. Mr. Henderson agreed to both treatments and asked Ms. Sawyer in Maine to wire the necessary funds to LSI in Florida. *Id.* ¶ 18-19. Concerned that the wired funds had not gone through properly, LSI communicated with Ms. Sawyer by telephone to obtain the funds for Mr. Henderson's further treatment. *Sawyer Decl.* ¶¶ 16-17. Mr. Henderson underwent the second treatment on October 14, 2008 and, several days later, returned to Maine. *Henderson Decl.* ¶ 23.

By December 2008, Mr. Henderson's back pain had returned. *Id.* ¶ 24. He made a number of calls to LSI in December 2008 and January 2009 to speak with Dr. Prada, but was unable to reach him. *Id.* ¶ 25. In January 2009, Dr. Prada telephoned Mr. Henderson in Maine and directed him to obtain another MRI and to send the results to him in Florida. *Id.* ¶ 26. Two weeks after sending the MRI results to Dr. Prada, Mr. Henderson, at LSI's direction and while in considerable pain, returned to Florida for another consultation at LSI which took place on February 18, 2009. *Id.* ¶¶ 27-29; *Compl.* ¶43. Even though Dr. Prada had the MRI results for approximately two weeks, Mr. Henderson believed he was reviewing them for the first time during the consultation. *Id.* ¶ 30. Dr. Prada informed Mr. Henderson that there were no further surgical treatments that LSI could provide him for his back condition but that he could administer a steroid injection for the pain. *Id.* Even though Dr. Prada conducted no physical examination of Mr. Henderson, he reached this conclusion in less than three minutes of reviewing the MRI results. *Id.* Mr. Henderson received the injection and returned to Maine, but he asserts he never would have traveled to Florida if he had known that the only available treatment was steroid injection because such a treatment was available in Maine. *Id.* ¶¶ 31-32.

During this same time, Mr. Henderson became concerned that his insurer, Aetna, had not reimbursed him for his first two LSI treatments in October 2008. *Id.* ¶ 33. When Ms. Sawyer, at Mr. Henderson's request, asked Aetna about the status of his reimbursement, Aetna told her that it lacked the necessary

information from LSI.  *Id.* ¶ 34.  Ms. Sawyer telephoned LSI and requested the missing information and LSI assured her that the information had been sent to Aetna.  *Id.* ¶ 35.

In February 2009, Aetna denied Mr. Henderson's claim for reimbursement. *Id.* ¶ 36.  Ms. Sawyer again contacted LSI regarding Aetna's denial of Mr. Henderson's claim.  *Id.* ¶ 37.  Steven Torres, an LSI employee, advised Ms. Sawyer that Mr. Henderson should appeal Aetna's denial.  *Id.*  To assist with the appeal, Mr. Torres emailed Mr. Henderson's patient ledger to Ms. Sawyer in Maine.  *Id.* ¶ 38.  The patient ledger itemized the costs of treatment and detailed the services provided totaling $124,979.95, reduced by $55,500.00 to reflect Mr. Henderson's two advance payments.  *Id.*  In addition to the email, LSI faxed Ms. Sawyer in Maine a form letter to be edited and sent to Aetna.  Ms. Sawyer completed and mailed LSI's form letter on February 27, 2009.  *Id.* ¶ 39.

The appeals process with Aetna continued and in March 2009, Mr. Henderson employed the assistance of Maine attorney, Timothy Pease.  *Pl.'s Opp'n* Attach. 3 ¶ 5 (*Pease Decl.*).  Throughout the remainder of 2009, Mr. Pease was in contact with LSI in an attempt to have Aetna cover the LSI treatments.  *Id.* ¶¶ 6-22.  These contacts included numerous telephone calls and emails from LSI to Mr. Pease in Maine.  *Id.*  On October 23, 2009, Aetna denied Mr. Henderson's claim a second time because it determined that the treatments provided by Dr. Prada and LSI were "experimental or investigational."  *Henderson Decl.* ¶ 49; *Sawyer Decl.* ¶ 29.  Mr. Henderson requested an external review of the second denial, which

Medwork Independent Review conducted. *Henderson Decl.* ¶ 50. On October 19, 2010, Aetna, LSI, and Mr. Henderson participated in a telephone hearing, and, nine days later, the independent reviewer issued a written decision denying coverage. *Id.* ¶¶ 50-51; *Compl.* ¶ 39. On November 20, 2009, Mr. Henderson and Mr. Pease held a conference call with the Director of Patient Financial Services for LSI, David Neal, in an effort to get additional information from LSI and discuss the level of care Mr. Henderson had received at LSI. *Pease Decl.* ¶¶ 7, 16. After the November 20 call, Mr. Neal emailed Mr. Pease indicating again that LSI would do its best to resolve Mr. Henderson's issues. *Id.* ¶ 17. On December 10, 2009, Dotty Bollinger, the Senior Vice President of Medical Operations at LSI, and Mr. Pease participated in a conference call to discuss information supplied by LSI to support Mr. Henderson's attempts for reimbursement from Aetna, as well as to discuss Mr. Henderson's treatment at LSI. *Id.* ¶ 19; *Bollinger Decl.* ¶ 1. The next day, Ms. Bollinger emailed Mr. Pease providing advice on tactics he could employ to obtain coverage from Aetna. *Pease Decl.* ¶ 20. She also offered to pay Mr. Henderson $10,000 for poor customer service he received from LSI. *Id.*

During these efforts to obtain reimbursement for the LSI treatments, Mr. Henderson traveled to Massachusetts to undergo further back surgery at the Lahey Clinic. *Henderson Decl.* ¶¶ 44. The treatment finally alleviated his chronic back pain and Aetna covered the Lahey Clinic procedures. *Id.* ¶¶ 44, 46.

## II.   THE PARTIES' POSITIONS

### A.   The Defendants' Position

#### 1.   General Personal Jurisdiction

The Defendants move to dismiss for lack of personal jurisdiction, asserting that LSI does not have the minimum "continuous and systematic contacts with the state of Maine or any Maine-based contacts" necessary to sustain personal jurisdiction. *Defs.' Mot.* at 3. Defendants argue that "LSI does not transact business or hold any licenses in Maine; own real estate or have a plant, office, or facility in Maine; provide medical services in Maine or employ anyone providing medical services in Maine; or have a telephone listing or a mailing address in Maine." *Id.* at 5. They analogize the facts of this case to those of *Cossaboon v. Maine Medical Center*, 600 F.3d 25 (1st Cir. 2010), where the First Circuit found general personal jurisdiction lacking in New Hampshire because of insufficient Maine contacts. LSI contends that its website provides only information and so is less interactive than the Maine Medical Center website that the First Circuit found insufficient to support general jurisdiction. *Id.* at 7. In addition, the Defendants assert that the number of Maine patients treated by LSI is "even less substantial" than the 1.23% of New Hampshire patients treated by Maine Medical Center in *Cossaboon*. *Id.* at 7-8. They further argue that Plaintiff "unilaterally chose to travel to and receive medical treatment at LSI's facility." *Id.* at 8.

## 2.   Specific Personal Jurisdiction

Turning to specific personal jurisdiction, the Defendants provide three factors that must be considered: whether the claim directly relates to or arises out of Defendants' contact with the forum, whether the contact constitutes purposeful availment of the forum's laws, and whether the exercise of jurisdiction is reasonable. The Defendants assert that there is no nexus between Plaintiff's claim

and their contact with the state of Maine. *Id.* at 9. They claim that Mr. Henderson's numerous causes of action all stem from events that occurred at LSI's facility in Tampa, Florida. *Id.* at 9-10. The Defendants contend that the "notions of fair play and substantial justice" weigh against this Court exercising specific personal jurisdiction. *Id.* at 10. They assert that it would be "onerous" for them to travel to Maine to appear and defend this matter. *Id.* at 11. Furthermore, the Defendants assert that Maine has no interest in adjudicating this dispute, as the events that prompted the Plaintiff's claims occurred outside the state's borders. *Id.* at 11.

### 3.    Venue

The Defendants also contend that venue is not proper in this Court. In their view, the events giving rise to Mr. Henderson's claims all occurred in Florida. Consequently, the Defendants move to have the matter dismissed pursuant to Rule 12(b)(3), or transferred to an appropriate venue in Florida. *Id.* at 11-12.

### 4.    Statute of Limitations:

### a.    Florida medical malpractice statutes

Alternatively, the Defendants argue Plaintiff's claims are statutorily barred. The Defendants concede that under traditional choice of law rules, the statute of limitations of the forum determines the timeliness of an action, even if the substantive law of another state applies to the case. Thus, Maine's statute of limitations would normally apply to this matter. However, the Defendants cite *Siegemund v. Shapland,* 247 F. Supp. 2d 1, 6 (D. Me. 2003), as reflecting an exception to the traditional rule where the claim is predicated on a foreign statutory

9

enactment. *Id.* at 12. In the Defendants' view, Mr. Henderson's claims are predicated on Florida Statute § 95.11(4)(b)[3] and are therefore subject to Florida's statute of limitations which is measured "from the time the incident giving rise to the action occurred or within 2 years from the time the incident is discovered." *Id.* at 12-13. The Defendants argue that Mr. Henderson's claims became time barred in October 2010, "weeks before the complaint was filed in the Penobscot County Superior Court." *Id.* at 13-14.

### b.    Maine Health Security Act

The Defendants further argue that if the Court finds that Florida law does not apply, then the Maine Health Security Act (MHSA) governs his claims because they feature allegations of "professional negligence."[4] *Id.* at 14. According to the Defendants, Mr. Henderson failed to comply with the "paramount 'procedural requirement' of the MHSA" by failing to "[s]erve[] and file[] a written notice of claim under oath in accordance with section 2853 and submit his claim to the medical malpractice pre-litigation screening panel process." *Id.* at 15 (quoting 24 M.R.S. §2903(1)). The Defendants argue that dismissal is justified because the function of MHSA's oath requirement is to prevent a plaintiff from filing a "frivolous, untrue, inflated or mistaken claim." *Id.* at 16.

### B.    Dale Henderson's Position

---

[3] Fla. Stat. § 95.11 is titled "Limitations other than for the recovery of real property." The relevant portion, § 95.11(4)(b), reads: "An action for medical malpractice shall be commenced within 2 years from the time the incident giving rise to the action occurred or within 2 years from the time the incident is discovered, or should have been discovered with the exercise of due diligence."

[4] 24 M.R.S. § 2853 provides the procedure for the submission of claims: "A person may commence an action for professional negligence by . . . ."

### 1.   Jurisdiction

Mr. Henderson does not address the Defendants' general jurisdiction argument. Instead, he maintains that this Court has specific personal jurisdiction over the Defendants. *Pl.'s Opp'n.* at 2-3. Looking to Maine law, Mr. Henderson applies the three-part test outlined in *Connelly v. Doucette*, 909 A.2d 221 (Me. 2006), and concludes that all three conditions for specific jurisdiction are satisfied because: "(1) Maine has a legitimate interest in the subject matter of the litigation; (2) the defendant, by his or her conduct, reasonably could have anticipated litigation in Maine; and (3) the exercise of jurisdiction by Maine's courts comports with traditional notions of fair play and substantial justice." *Id.* at 3, 9 (quoting *Connelly*, 909 A.2d at 223).

Regarding the first condition, Mr. Henderson argues that Maine has a legitimate interest in affording its citizens, such as Mr. Henderson, a forum to redress injuries caused by nonresidents. In addition, he says that Maine has an interest in the subject matter of this litigation because he suffered in Maine from the effects of the Defendants' negligent treatment, he underwent medical testing in Maine at the Defendants' direction, and many of the corresponding witnesses and medical records are located in Maine. *Id.* at 3-4. Moreover, Mr. Henderson asserts that Maine has an interest in protecting him from the economic harms he suffered at the hands of the Defendants due to their alleged misrepresentations regarding insurance coverage. *Id.* at 4.

Applying the second prong of the analysis, Mr. Henderson argues that the Defendants reasonably could have anticipated litigation in Maine because they were

aware of the continuing detrimental impact their conduct was having in Maine.  *Id.*
Mr. Henderson submits that LSI falsely indicated that Aetna would cover the costs
of treatment and was aware of the harmful impact of its misrepresentations after
he informed LSI of Aetna's denial of his claim.  *Id.* at 5.  Mr. Henderson emphasizes
that the Defendants' communications into Maine after knowledge of his insurance
claim denial "perpetuated LSI's fraudulent representations that there would be
insurance coverage."  *Id.*  Mr. Henderson insists that LSI's efforts, after receiving
knowledge of Aetna's denial of coverage, were an attempt to "deflect attention away
from its knowing misrepresentations" and to "delay any potential legal action."  *Id.*
He argues that this behavior, coupled with LSI's voluntary contacts with him and
his attorney via telephone, email, fax, website, and national publications,
constitutes conduct that satisfies the second part of the personal jurisdiction
inquiry—the Defendants could have reasonably anticipated litigation in Maine.  *Id.*
at 5-8.

    As to the third part of the analysis, Mr. Henderson contends that the fair
play and substantial justice inquiry is also met.  *Id.* at 8-9.  He submits that once
the plaintiff has satisfied the first two prongs of the jurisdictional analysis, the
burden then shifts to the defendant to prove that notions of fair play and
substantial justice would be offended.  *Id.* at 8.  In his view, the Defendants cannot
meet this burden as all factors weigh in favor of exercising jurisdiction.  *Id.* at 9.
Mr. Henderson asserts that the nature and purpose of the Defendants' contacts
with Maine were "to induce [him] to travel to Florida to receive medical treatments,

to ensure that those treatments were paid for in advance, and to obfuscate wrongdoing with regard to the issue of insurance coverage." *Id.* at 9.  According to Mr. Henderson, all contacts LSI had with Maine are directly related to his cause of action.

Although Mr. Henderson concedes that Florida has an interest in the controversy because "most of the wrongful activities occurred there," he contends that these factors do not trump all the other factors weighing in favor of Maine exercising jurisdiction.  *Id.* at 9.  Regarding the convenience and fairness to both parties, Mr. Henderson asserts that LSI is a corporate entity and Dr. Prada is a practicing physician, suggesting they have the funds to travel to and litigate in Maine.  *Id.*  By contrast, Mr. Henderson explains that he has significant difficulty traveling and that enduring a long flight or drive would be particularly painful given his history of back pain.  *Id.*  Thus, Mr. Henderson concludes that convenience and fairness weigh in his favor.  *Id.*

Turning to federal law, Mr. Henderson asserts that the three-part due process inquiry of specific jurisdiction is also satisfied because his claims are directly related to LSI's contacts with Maine, LSI's contacts constitute purposeful availment, and jurisdiction is reasonable under the First Circuit's "gestalt" factors. *Id.* at 10.  Applying the first prong of the federal analysis, Mr. Henderson contends that LSI's direct contacts with Maine underlie the claims in his Complaint.  *Id.*  He cites the telephone calls LSI made to him in Maine to discuss his anticipated treatment and to confirm that his insurer would cover the cost of treatment, the

contacts by LSI to Ms. Sawyer in Maine to ensure receipt of advance payment, and Dr. Prada's telephone call instructing Mr. Henderson to obtain an MRI and to have the results sent to him.  *Id.*  He asserts that he never would have traveled to Florida for treatment if he had not received these contacts from the Defendants.  *Id.*

As to the second prong of the federal analysis, Mr. Henderson maintains that the Defendants' contacts with Maine represent a purposeful availment of the benefits and protections of Maine laws.  *Id.* at 11.  He argues that the Defendants voluntarily and knowingly solicited business from Maine when they followed up on his initial inquiry with several phone calls and facsimiles meant to induce Mr. Henderson to undergo treatment in Florida.  *Id.*  Moreover, Mr. Henderson submits that LSI's awareness that he expected his insurance to cover his treatment and that Aetna found the treatments problematic made it foreseeable and should have put the Defendants on notice that they may be held accountable in Maine.  *Id.* at 12. Furthermore, Mr. Henderson maintains that LSI's minimum contacts demonstrate that the Defendants purposefully availed themselves of the benefits of doing business in Maine and have the reciprocal obligation to submit to Maine's jurisdiction.  *Id.* at 13.

Turning to the third prong of the federal analysis, Mr. Henderson maintains that asserting personal jurisdiction over the Defendants would comport with notions of fair play and substantial justice.  *Id.* at 14.  Reviewing the so-called gestalt factors, Mr. Henderson explains that, having satisfied the first two prongs, it is the burden of the Defendants to make a "'compelling case' that litigation in Maine

would be unreasonable and unfair." He argues that the Defendants cannot shoulder this load. *Id.* at 13-14.

## 2. Venue

Mr. Henderson opposes the Defendants' motion to dismiss for improper venue. He asserts that venue is proper in the District of Maine because a substantial part of the events giving rise to his claims occurred in Maine pursuant to 28 U.S.C. § 1391(a)(2). *Id.* at 15. Mr. Henderson highlights his claims of fraud, unfair trade practices, fraudulent concealment, and negligent misrepresentation as claims arising directly from the Defendants' contacts with the District of the Maine. *Id.* Mr. Henderson also opposes their alternative request to have venue transferred to Florida, claiming that the Defendants cannot carry the "substantial burden" for a change of venue because "[w]itnesses are to be found in both Maine and Florida, as are documents and records." *Id.*

## 3. Statute of Limitations

Turning to the Defendants' alternative motion for dismissal on substantive grounds, Mr. Henderson urges the Court to consider now only the jurisdictional question. *Id.* at 16. Nonetheless, he opposes the Defendants' assertion that the claims must be dismissed pursuant to Florida's two year statute of limitations. *Id.* Mr. Henderson also opposes the Defendants' contention that he has failed to comply with the MHSA and that dismissal is appropriate. *Id.*

### a. Florida medical malpractice statutes

Mr. Henderson disputes that the Florida medical malpractice statute applies and instead submits that Maine's six-year statute of limitations applies to this case.

*Id.* He agrees with the Defendants that under the general choice of law rule, the statute of limitations of the forum controls, yet disagrees that the claims fall under the "foreign statutory enactment" exception to the traditional rule. *Id.* at 16-17. Mr. Henderson contends that none of the claims set forth in his Complaint is predicated on a foreign statutory enactment. *Id.* at 17. He argues that the statutory provision cited by the Defendants is merely "Florida's statute of limitations for causes of action other than for the recovery of real property" and that the substantive claims of his complaint arise under Maine common law. *Id.* Mr. Henderson reasons that if the case were transferred to Florida for lack of personal jurisdiction, choice of law rules would dictate that Maine's statute of limitations applied. *Id.* at 17-18. Therefore, according to Mr. Henderson, to accept the Defendants' assertion that Florida Statute § 95.11(4)(b) applies would lead to the illogical result of applying Maine's statute of limitations to a lawsuit in Florida and Florida's statute of limitations to a lawsuit in Maine. *Id.* at 18 n.3.

**b.   Maine Health Security Act**

Mr. Henderson asserts that the Maine Health Security Act (MHSA) does not apply to LSI as LSI is not "licensed or otherwise authorized by the laws of this State" as the Act requires for its application. *Id.* at 19. Mr. Henderson withdraws Count VII, his claim of negligence against Dr. Prada, as it is the only count that, in his view, could trigger the MHSA statute of limitations. *Id.* at 19-20.

**III.   DISCUSSION**

**A.   Jurisdiction**

**1.   Legal Standard**

"To hear a case, a court must have personal jurisdiction over the parties, 'that is, the power to require the parties to obey its decrees.'" *Astro-Med, Inc. v. Nihon Kohden Am., Inc.,* 591 F.3d 1, 8 (1st Cir. 2009) (quoting *United States v. Swiss Am. Bank, Ltd.,* 191 F.3d 30, 35 (1st Cir. 1999)).   On a motion to dismiss for lack of personal jurisdiction, pursuant to Rule 12(b)(2), "the plaintiff ultimately bears the burden of persuading the court that jurisdiction exists."  *Id.*  In resolving the issue, district courts have at their disposal "a trio of standards, each corresponding to a level of analysis, that might usefully be employed when a trial court comes to grips with a motion to dismiss for want of personal jurisdiction."  *Foster-Miller, Inc. v Babcock & Wilcox Can.,* 46 F.3d 138, 145 (1st Cir. 1995).   Of these standards— prima  facie,  preponderance-of-the-evidence,[5]  and  likelihood-of-existence-of-necessary-facts[6]—the Court employs the prima facie evidence standard as it is the

---

[5] To apply the preponderance-of-the-evidence standard, the court must "embark on a factfinding mission in the traditional way, taking evidence and measuring the plaintiff's jurisdictional showing." *Foster-Miller,* 46 F.3d at 145.  The standard is properly employed when the court

> determines that in the circumstances of a particular case it is unfair to force an out-of-state defendant to incur the expense and burden of a trial on the merits in the local forum without first requiring more of the plaintiff than a *prima facie* showing of facts essential to *in personam* jurisdiction.   A court may so determine, for example, when the proffered evidence is conflicting and the record is rife with contradictions, or when a plaintiff's affidavits are "patently incredible . . . ."

*Id.* at 145-46 (quoting *Boit v. Gar-Tec Prods., Inc.,* 967 F.2d 671, 676 (1st Cir. 1992)).  Because the standard requires "a full-blown evidentiary hearing at which the court will adjudicate the jurisdictional issue definitively before the case reaches trial," the First Circuit warns that it "must be used discreetly." *Id.* at 146.
[6] The "likelihood standard" strikes a middle ground between the prima facie and preponderance standards.  *Id.*  It is used

> "[i]n the special circumstance in which the assertion of jurisdiction is bound up with the claim on the merits, the possibility of preclusion renders use of the preponderance standard troubling, while the possibility of permitting a dubious case to proceed beyond the pleading stage, and even to trial, though the court eventually

"most conventional" and is "a useful means of screening out cases in which personal jurisdiction is obviously lacking." *Id.; see Astro-Med,* 591 F.3d at 8 ("[A] district court 'may choose from among several methods for determining whether the plaintiff has met its burden'") (quoting *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007))).

Under the prima facie standard, a district court may consider "only whether the plaintiff has proffered evidence that, if credited, [is] enough to support findings of all facts essential to personal jurisdiction." *Id.* (internal quotation marks omitted). The court "must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." *Id.* (internal quotation marks omitted). The court also "construe[s those proffers] in the light most congenial to the plaintiff's jurisdictional claim." *Id.* The facts put forward by the defendant are considered "only to the extent that they are uncontradicted." *Id.* Applying this standard, the Court accepts as true the facts alleged in Mr. Henderson's pleadings, affidavits, and other documents, and construes them in a jurisdictionally friendly light. The Court also considers the uncontroverted facts asserted by LSI.

In any case arising under diversity jurisdiction, a federal court's jurisdiction is "the functional equivalent of a state court sitting in the forum state." *N.*

---

will be found to lack jurisdiction, renders use of the prima facie standard undesirable."

*Foster-Miller,* 46 F.3d at 146. Under this standard, the court asks "whether the plaintiff has shown a likelihood of the existence of each fact necessary to support personal jurisdiction." *Id.* (quoting *Boit,* 967 F.2d at 676).

*Laminate Sales, Inc. v. Davis,* 403 F.3d 14, 24 (1st Cir. 2005) (internal quotation marks omitted).  Therefore, to establish personal jurisdiction over the Defendants, Mr. Henderson must demonstrate that Maine's long-arm statute allows jurisdiction and that its exercise does not offend the Due Process Clause of the United States Constitution.  *See id.*  "[T]o insure maximum protection to citizens of this State," Maine's long-arm statute, extends "to the fullest extent permitted by the due process clause of the United States Constitution."  14 M.R.S. § 7040A(1).  Because Maine's jurisdictional statute is coextensive with the limits of the Due Process Clause of the Fourteenth Amendment, the two inquiries merge.  *Harlow v. Children's Hosp.,* 432 F.3d 50, 57 (1st Cir. 2005); *see also Elec. Media Int'l v. Pioneer Commc'ns of Am., Inc.,* 586 A.2d 1256, 1256 (Me. 1991).  The due process inquiry thus determines the limits of the Court's jurisdictional reach in this diversity case.

Due process "requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Astro-Med,* 591 F.3d at 9 (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 319 (1945)).  The Due Process Clause provides two bases by which a non-resident defendant may be subject to the jurisdiction of a court: general and specific jurisdiction.  General jurisdiction exists for a "cause of action [which] may be unrelated to the defendant's contacts, [when] the defendant [has] continuous and systematic contacts with the state."  *Lechoslaw v. Bank of Am., N.A.*, 618 F.3d 49, 54 (1st Cir. 2010) (quoting *Harlow,* 432 F.3d at

19

57.  Specific jurisdiction requires that "the plaintiff's claim must be related to the defendant's contacts."  *Id.*

The Defendants assert that the Court lacks both general and specific jurisdiction to hear this case.  *Defs.' Mot.* at 3.  Mr. Henderson contends that only specific jurisdiction exists.  *Pl.'s Opp'n* at 2-14; *Defs.' Reply* at 1.  The Court regards any assertion of general jurisdiction as waived and considers only specific jurisdiction.  *See Astro-Med,* 591 F.3d at 19 ("[I]ssues adverted to . . . in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned" (internal quotation marks omitted)); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation 'to spell out its arguments squarely and distinctly, or forever hold its peace.'" (quoting *Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988))).

### 2.    Specific Jurisdiction

The First Circuit has divided the specific jurisdiction and subsequent minimum contacts analysis into three inquires: (1) relatedness; (2) purposeful availment; and (3) reasonableness.  *See N. Am. Catholic Educ. Programming Found., Inc., v. Cardinale*, 567 F.3d 8, 16 (1st Cir. 2009) ("[A]llowing jurisdiction to be asserted as to a specific claim, can be established where the defendants availed themselves of the opportunity to do business in the state, the claim in question is related to that access and the so-called gestalt factors are consistent with requiring an out-of-state defendant to defend within the state.").

### a.    Relatedness

"[R]elatedness is the divining rod that separates specific jurisdiction cases from general jurisdiction cases. . . . [I]t ensures that the element of causation remains in the forefront of the due process investigation." *Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 714 (1st Cir. 1996) (citing *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 206 (1st Cir. 1994)). The relatedness inquiry asks whether "the claim underlying the litigation directly arises out of, or relates to, the defendant's forum-state activities." *Astro-Med,* 591 F.3d at 9 (quoting *N. Laminate Sales*, 403 at 25). It is a "flexible, relaxed standard." *N. Laminate Sales,* 403 F.3d at 25.

The fact that the Defendants' Maine-based contacts occurred remotely, primarily through fax and telephone conversations, is not necessarily fatal to a finding of jurisdiction. The First Circuit explained that "forum-state contacts need not involve physical presence," *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 290 (1st Cir. 1999), and "[t]he transmission of information into [the forum state] by way of telephone . . . or mail is unquestionably a contact for purposes of [the jurisdiction] analysis." *Sawtelle v. Farrell*, 70 F.3d 1381, 1389-90 (1st Cir. 1995).[7]

### i.   Breach of Contract

Count II of Mr. Henderson's Complaint alleges breach of contract. Mr. Henderson alleges two separate breaches: (1) a breach of the Defendants' agreement to "provide medically accepted treatment for Plaintiff's diagnosed condition"; and (2)

---

[7] The First Circuit has also noted that "there is a natural blurring of the relatedness and purposeful availment inquiries in cases (like this one) in which the alleged contacts are less tangible than physical presence." *Phillips Exeter*, 196 F.3d at 289. Nonetheless, the relatedness and purposeful availment inquiries are different. *Id.*

a breach of their agreement to "take all reasonable actions to ensure Aetna covered the treatment Defendants provided to Plaintiff." *Compl.* ¶¶ 57-58. "To satisfy the relatedness prong this claim must arise out of or relate to [the Defendants'] contacts with Maine. This requirement is met in a breach of contract claim where [the Defendants'] forum-based activities are 'instrumental either in the formation of the contract or in its breach.'" *New Life Brokerage Servs., Inc. v. Cal-Surance Assocs. Inc.*, 222 F. Supp. 2d 94, 102 (D. Me. 2002) (quoting *Phillips Exeter*, 196 F.3d at 289). However, "the mere existence of a contractual relationship between an out-of-state defendant and an in-state plaintiff does not suffice, in and of itself, to establish jurisdiction in the plaintiff's home state." *Phillips Exeter*, 196 F.3d at 290. Rather, as the Supreme Court explained in *Burger King Corp. v. Rudzewicz*, "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." 471 U.S. 462, 479 (1985)*; Phillips Exeter*, 196 F.3d at 290 (quoting the Supreme Court's rule and approving the district court's focus on the defendant's forum-based activities rather than on the contractual relationship).

The Defendants' relevant forum-based activities consist of their communications with Mr. Henderson while he was in Maine before his initial trip to Florida in October 2008. However, not all communications between LSI staff and Mr. Henderson touch upon his breach of contract claim. It was not until September 2008—after several attempts by Mr. Henderson and his representatives to attract

the Defendants' attention—that the relevant communications began.  At this point, LSI finally returned Mr. Henderson's calls to discuss the cost of his potential treatment and to schedule an appointment.   During that conversation, LSI represented to Mr. Henderson that he would have to pay $30,000 for his treatment in advance, but that his insurance provider, Aetna, would reimburse the costs and cover the treatment.  *Henderson Decl.* ¶¶ 12-13; *Sawyer Decl.* ¶ 10.   Shortly thereafter, LSI again contacted Mr. Henderson in Maine via facsimile with a list of hotels where he could stay while in Florida during his treatment.  *Henderson Decl.* ¶ 14; *Sawyer Decl.* ¶ 10.  LSI also faxed Mr. Henderson a patient registration packet with several forms for him to fill out and return to Florida.[8]  *Henderson Decl.* ¶ 15; *Sawyer Decl.* ¶ 11.   When Mr. Henderson traveled to LSI's office in Florida to receive a consultation and surgery, LSI communicated numerous times with Ms. Sawyer in Maine to ensure LSI's receipt of payment.  *Henderson Decl.* ¶¶ 21-22; *Sawyer Decl.* ¶¶ 16-17.   Under the "flexible, relaxed standard" of the relatedness test, these contacts are sufficient.

### ii.    Tort Claims

The Court turns to Mr. Henderson's tort claims.[9]   The relatedness inquiry here focuses on proximate cause; the court "must probe the causal nexus between the defendant's contacts and the plaintiff's cause of action."  *Astro-Med*, 591 F.3d at 9 (quoting *Phillips Exeter*, 196 F.3d at 289).  "The defendant's in-state conduct must

---

[8]  Under the prima facie standard, the patient forms that LSI sent from Florida to Maine and that Mr. Henderson completed in Maine and returned to LSI in Florida form part of their contract.

[9]  For specific jurisdiction, the Court must separately analyze each claim against each defendant. *Phillips Exeter*, 196 F.3d at 289.

form an 'important, or at least material, element of proof' in the plaintiff's case."
*Harlow*, 432 F.3d at 61 (quoting *Marino v. Hyatt Corp.*, 793 F.2d 427, 430 (1st Cir. 1986)).

The Defendants' relevant in-state activities consist of LSI's communications through the telephone, email and facsimile directed into Maine before and after Mr. Henderson's initial treatment.  In addition to the communications regarding Mr. Henderson's contract claim, the Defendants directed contacts toward Maine after Mr. Henderson's October 2008 treatment in Florida.  For example, when Mr. Henderson's back pain returned and he repeatedly contacted LSI during December 2008 and January 2009,[10] Dr. Prada eventually called Mr. Henderson back and directed him to obtain an MRI and to send him the results as a precursor to subsequent treatment.  *Henderson Decl.* ¶ 24-26.  In addition, the Defendants directly contacted Mr. Pease, Ms. Sawyer, and Mr. Henderson, all in Maine, to assist Mr. Henderson in obtaining insurance coverage.  *Pease Decl.* ¶¶ 7-9, 15-22; *Henderson Decl.* ¶¶ 38-39, 47-48, 50; *Sawyer Decl.* ¶¶ 23-24, 27-28.

The Defendants assert that their post-October 2008 contacts with Maine are "not relevant to the Court's inquiry because they took place well after the alleged wrongdoing in October 2008."  *Defs.' Mot.* at 9 n.3.  Presumably, the alleged wrongdoing to which the Defendants refer is the initial treatment Mr. Henderson received in Florida.  They assert that evidence of post-tort contact after Mr. Henderson's initial trip to Florida is irrelevant to the specific jurisdiction analysis.

---

[10] Mr. Henderson's Declaration does not specify the number of times he called LSI attempting to reach Dr. Prada.  *Henderson Decl.* ¶ 25.

*Id.* (citing *Harlow*, 432 F.3d at 61).   However, the First Circuit's statements in *Harlow* were not so simplistic.   The Court explained that the "specific jurisdiction analysis require[s] that the proper focus be on those contacts leading up to and surrounding the claimed injury . . . ."   *Harlow*, 432 F.3d at 61.   Unlike this case, the bulk of post-tort evidence of contacts with Maine in *Harlow* was "simply not related at all to the alleged malpractice," and consisted of evidence of contacts between the defendant and Maine more than five years after the alleged tort occurred.   *Id.*

Mr. Henderson's Complaint alleges tort claims stemming from the Defendants' representations that his insurer would reimburse the costs of his treatments and his claims that the Defendants performed medically unnecessary procedures on him.   The contacts LSI had with the state of Maine after Mr. Henderson's October 2008 surgery concerned the effectiveness of the surgery, the possibility of additional treatment, and Mr. Henderson's attempts to obtain insurance reimbursement from Aetna.   They are directly related to Mr. Henderson's tort claims and "form an important, or at least material, element of proof in the plaintiff's case."   Mr. Henderson satisfies the first jurisdictional hurdle.

### b.   Purposeful Availment

To satisfy the second prong of the minimum contacts analysis, "the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable."   *Astro-Med*, 591 F.3d at 10 (quoting *N. Laminate Sales*, 403 F.3d at 25).   "The question is whether a defendant has followed

a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct." *J. McIntyre Mach. Ltd. v. Nicastro*, 131 S. Ct. 2780, 2789 (2011).

The purposeful availment inquiry ensures "that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous' contacts with the forum state." *Sawtelle*, 70 F.3d at 1391 (quoting *Keeton v. Hustler Magazine, Inc.*, 564 U.S. 770, 774 (1984)). "The inquiry is 'highly idiosyncratic, involving an individualized assessment and factual analysis of the precise mix of contacts that characterize each case.'" *Cossaboon*, 600 F.3d at 33. The "cornerstones upon which the concept of purposeful availment rest are voluntariness and foreseeability." *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 61 (1st Cir. 2002) (citations omitted).

### i.   LSI-Henderson Contacts

### I.   Voluntariness

"The focus of the purposeful availment inquiry is the defendant's intentionality." *Adams v. Adams*, 601 F.3d 1, 6 (1st Cir. 2010). "Voluntariness requires that the defendant's contacts with the forum state proximately result from actions by the defendant *himself*. The contacts must be deliberate, and not based on the unilateral actions of another party." *Id.* (emphasis in original) (quoting *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 28 (1st Cir. 2008) (internal citations omitted). "Promotional correspondence intended to solicit business represents voluntary

availment of a forum, regardless of whether Plaintiff initiated the contact." *Lucerne Farms v. Baling Techs., Inc.*, 226 F. Supp. 2d 255, 260 (D. Me. 2002).

Mr. Henderson initiated the contact with the Defendants when his personal assistant called the company in Florida.  The company voluntarily returned his phone call and began a series of promotional correspondence—multiple phone calls, faxes, and emails—intended to solicit Mr. Henderson's business and induce him to come to Florida for LSI's advertised surgery.  LSI actively worked with Mr. Henderson and his staff to facilitate his surgeries in Florida, including sending him a list of hotels where he could stay during his Florida treatment and working with him to persuade Aetna to pay for the treatments.  Such intentional contacts with a potential patient-customer, although in response to Mr. Henderson's initial inquiry, constitute a voluntary solicitation of Maine business.

## II.   Foreseeability

"Foreseeability requires that the contacts with the forum state be of a nature that the defendant could reasonably anticipate being haled into court there." *Adams*, 601 F.3d at 6 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)) (internal quotation marks omitted).  *See also Lucerne Farms*, 226 F. Supp. 2d at 260 ("Given these voluntary decisions to avail itself of the forum, Defendant should have reasonably anticipated litigation in Maine.").  A "[d]efendant's continuing relationship with the forum indicates that litigation in Maine was foreseeable." *Id.*  The foreseeability inquiry also "explores whether the

27

defendant benefited from the forum-based contacts in a way that made jurisdiction foreseeable." *New Life Brokerage*, 222 F. Supp. 2d at 106.

The Defendants voluntarily undertook their Maine contacts with the intention of becoming a provider of services to Mr. Henderson and so could reasonably anticipate being haled into court in this forum. Further, the Defendants embarked upon a continuing relationship with the forum through an exchange of phone calls, emails, faxes, payments, and other transmissions between Mr. Henderson in Maine and LSI in Florida. As medical providers, LSI and Dr. Prada also provided ongoing instructions for further testing in anticipation of the possible consequences of Mr. Henderson's surgery, including the event that happened—his back pain returning and necessitating further LSI treatments. Moreover, LSI clearly benefited from the Maine-based contact. The Defendants received at least $55,500 from performing Mr. Henderson's back surgery. It was foreseeable that LSI could end up in a Maine courtroom.[11]

### ii.   National print advertising by LSI

Mr. Henderson has more than just the traditional forms of purposeful availment to support his claim of personal jurisdiction over the Florida-based company. The Defendants also reached into Maine through national advertising,

---

[11] In fact, it would seem to be highly foreseeable to LSI that it could be haled into a non-Florida court given that there are at least two recently decided cases from other forum states dealing with the out-of-state treatment patients received from LSI. *See Bond v. Laser Spine Inst., LLC*, No. 10-1086, 2010 WL 3212480 (E.D. Pa. 2010) (denying LSI's motion to dismiss for lack of personal jurisdiction); *Morilla v. Laser Spine Inst., LLC*, No. 2:10-cv-01882, 2010 WL 3258312 (D.N.J. 2010) (granting LSI's motion to dismiss for lack of personal jurisdiction).

including the two ads that contributed to Mr. Henderson calling the institute: an advertisement in the DuPont Registry and one in the SkyMall catalog.

Nationwide advertising does not guarantee personal jurisdiction. The Supreme Court has not ruled specifically on jurisdiction based on national advertising, but it has sustained specific jurisdiction based on magazine distribution in forum states where the tort alleged is libel. *See Keeton*, 465 U.S. 781. Some of the Court's language suggests that personal jurisdiction could be sustained for other torts related to distribution within the forum state. For example, the Court noted that "the victim of any . . . tort, may choose to bring suit in any forum with which the defendant has 'certain minimum contacts such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Id.* at 780 (quoting *Int'l Shoe*, 326 U.S. at 316). It held that where a defendant "has continuously and deliberately exploited [the forum state's] market, it must reasonably anticipate being haled into court there . . . . [Defendant] produces a national publication aimed at a nationwide audience. There is no unfairness in calling it to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed." *Id.*

In a companion libel case to *Keeton*, the Court again upheld specific jurisdiction over a nationwide magazine in an out-of-state forum. *Calder v. Jones*, 465 U.S. 783 (1984). The Court rejected the magazine's assertion that "[t]he mere fact that they can 'foresee' that the article will be circulated and have an effect in [the forum state] is not sufficient for an assertion of jurisdiction." *Id.* at 789. The

29

Court stated that the responsible parties at the magazine "knew that the brunt of [their actions] would be felt by [the plaintiff] in the State in which she lives and works" so the magazine must "reasonably anticipate being haled into court there to answer for the truth of the statements made in their article." *Id.* at 790.

In 1996, the First Circuit held that a Hong Kong hotel was subject to specific jurisdiction because it had purposefully availed itself of the Massachusetts forum. *Nowak*, 94 F.3d at 716-19. The Court found that "[w]hether prompted or unprompted, [the defendant hotel group's] ongoing correspondence and relationship with [the plaintiff's employer] designed to bring Massachusetts residents into Hong Kong, rendered foreseeable the possibility of being haled into a Massachusetts court." *Id.* at 717. Mentioning that the direct correspondence with the plaintiff's employer alone "certainly" would have been enough to render jurisdiction foreseeable, the court went on to detail "an even more substantial attempt . . . to purposefully avail itself of the privilege of conducting business activities in the state." *Id.* The defendant "advertised its hotel in national and international publications that circulated in Massachusetts; it solicited by direct mail some of its previous guests residing in Massachusetts; and [it] listed its hotel in various hotel guides used at travel agencies in Massachusetts." *Id.* The First Circuit concluded that jurisdiction was appropriate "where the defendant purposefully derives economic benefits from its forum-state activities." *Id.* (internal citations omitted).[12]

---

[12] *Cossaboon v. Me. Med. Ctr.*, 600 F.3d 25 (1st Cir. 2010), cited by the Defendants, determined that the Maine-based defendant's advertising in New Hampshire was insufficient to support a finding of *general* jurisdiction. The court distinguished *Cossaboon* from *Soares v. Roberts*, 417 F. Supp. 304

Other circuit courts give national advertising varying degrees of weight in the purposeful availment analysis. *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1131 (10th Cir. 1991) ("By itself . . . national advertising that reaches the forum state is not always sufficient to establish minimum contacts"); *Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1305 (10th Cir. 1994) ("evidence of mere placement of advertisements in nationally distributed papers or journals does not rise to the level of purposeful contact with a forum required by the Constitution in order to exercise personal jurisdiction over the advertiser"); *Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 700 (3rd Cir. 1990) ("The marketing strategy provides, at best, tangential support for the assertion of personal jurisdiction. We have no evidence of [defendant's] solicitation in [the nationwide] magazine nor do we know how much business the [defendant] derives from its national advertising");[13] *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 573 (2d Cir. 1996) (finding exercise of general personal jurisdiction proper and citing as one of the reasons the "national advertising that reaches [the forum state of] Vermont and direct marketing to at least three Vermont firms"); *Bridgeport Music, Inc. v. Still N The Water Publ'g,* 327 F.3d 472, 481 (6th Cir.2003) ("advertising is among

---

(D.R.I. 1976), where "[t]he *Soares* court exercised *specific* jurisdiction over the defendant . . . noting that the facility's advertising had 'a direct connection with the case at bar' because the plaintiff was 'within the class of persons' the advertising was designed to reach." *Cossaboon*, 600 F.3d at 34 (quoting *Soares* at 307-08). Personal jurisdiction, therefore, "extended 'at least to those individuals whose business the solicitation was designed to obtain.'" *Id.* at 34-35.

[13] One district court in the Third Circuit has gone further and held that a national advertising campaign can provide the basis for specific jurisdiction if the advertisement is not passive but induces the individual to establish direct contact with a company—where the advertisements "bait the hook for potential customers to make more interactive contact." *Bragg v. Linden Research, Inc.*, No. 06-4925, 2007 WL 1549013 (E.D. Pa. May 30, 2007).

the activities that constitute 'reaching out' to forum state residents"); *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship*, 34 F.3d 410, 412 (7th Cir. 1994) (analogizing to *Calder* and holding that national television broadcast into forum state was sufficient for personal jurisdiction).

In *U.S. S.E.C. v. Carrillo*, 115 F.3d 1540 (11th Cir. 1997), the Eleventh Circuit addressed a case with advertising similar to that of LSI's SkyMall solicitation. There, foreign defendants "placed advertisements promoting [their] securities in *American Way,* the complimentary in-flight magazine of American Airlines, and *Lacsa's World,* a similar publication of Costa Rica's Lacsa Airlines." *Carrillo*, 115 F.3d at 1541. The government brought suit in Florida district court and the defendants moved for and received a dismissal based on lack of personal jurisdiction. *Id.* The Eleventh Circuit reversed. The court began its purposeful availment analysis by citing *World-Wide Volkswagen*, 444 U.S. at 295, for the "well settled" idea that "advertising that is reasonably calculated to reach the forum may constitute purposeful availment of the privileges of doing business in the forum." *Id.* at 1545.

The *Carrillo* Court went on to note that "[i]t is clear that the advertisements placed by [the defendant] in the complimentary magazine of American Airlines were reasonably calculated to reach readers in the *American* forum." *Id.* Even the *Lacsa's World* advertisements "were reasonably calculated to be read in the forum, in light of the fact that the ads and articles were in English and that the airline has numerous flights to and from the United States." *Id.* The court also found it

"relevant to the purposeful availment inquiry that the advertisements were published on sixteen occasions in two separate magazines over a span of two years." *Id.*

The *Carrillo* defendants argued "that the advertisements constituted only fortuitous or random contacts with the United States because they were placed in the in-flight magazines of airlines that fly around the world." *Id.* at 1546 n. 8. The Court responded:

> We find that it is irrelevant that the advertisements might have reached other forums in addition to the United States. The key point is that advertisements placed by [the defendant] in the complimentary magazine of American Airlines and ads in English in Lacsa's World were clearly calculated to reach the United States.

*Id.* It concluded that the advertisements and articles in the in-flight magazines constituted purposeful availment. *Id.* at 1546.

Here, Defendants advertised in a publication like SkyMall to reach potential patients who travel by air, which includes residents of every state. By their very nature, airline magazines and catalogues will be directed at forums other than Defendant LSI's home state of Florida. In effect, the Defendants want to have it both ways: for their medical practice, they purposefully avail themselves of national advertisements to attract and prosper from a national patient base, but for legal purposes, they insist their practice is merely local. As the Eleventh Circuit reasoned in *Carrillo*, by their placement in publications distributed in moving aircraft that are designed to reach multiple states and jurisdictions, LSI's ads "were reasonably calculated to be read" in Maine and by residents of Maine who are

traveling elsewhere.  The fact that the ads likely reached other forums through the same means does not defeat specific personal jurisdiction here in Maine.

Here too it is relevant to the Court's purposeful availment analysis that the Defendants advertised in at least one other publication that reached Maine residents.  Like the defendants in *Keeton*, LSI produced a national publication—in the form of an advertisement—aimed at a nationwide audience.  Although the advertisements placed by the Defendants in national magazines were not the direct cause of Mr. Henderson's injury, the Court has already determined that they are related to his surgery and subsequent lawsuit.  As in *Keeton* and *Calder*, the Defendants here must answer for these advertisements when they knew that injuries could be felt by plaintiffs in the states where they live, work, and first saw the national ads touting LSI's Florida medical practice.

Further, this Court follows the First Circuit's example in *Nowak*.  It does not matter whether Mr. Henderson prompted the initial LSI phone call.  Because the Defendants' "ongoing correspondence and relationship" with Mr. Henderson was "designed to bring" him, a Maine resident, into Florida, this "rendered foreseeable the possibility of being haled into a [Maine] court."  Like the *Nowak* Court, this Court adds to the traditional analysis of phone and mail correspondence the fact that the defendant also advertised in "national and international publications that circulated in" Maine.  The Defendants are "purposefully deriv[ing] economic benefits" from their activities that deliberately reach Maine—LSI's advertising and contacts with Maine residents earned it at least two patients from this forum, Mr.

Henderson and Mr. Anderson.  The Court considers national advertising to be a relevant factor in determining whether the Defendants purposefully availed themselves of this forum.

### iii.    LSI's website

The Defendants also operated a website aimed at bringing in patients from other states.  The use of nationally accessible websites like this one further complicates the purposeful availment inquiry.

The First Circuit has held that "the mere existence of a website that is visible in a forum and that gives information about a company and its products is not enough, by itself, to subject a defendant to personal jurisdiction in that forum." *Cossaboon*, 600 F.3d at 35 (quoting *McBee v. Delica Co.*, 417 F.3d 107, 124 (1st Cir. 2005)).   "[G]iven the omnipresence of Internet websites today, allowing personal jurisdiction to be premised on such a contact alone would 'eviscerate' the limits on a state's jurisdiction over out-of-state or foreign defendants."  *McBee*, 417 F.3d at 124.

A district court in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997) first articulated a personal jurisdiction analysis for websites, still used by many courts today.  In *Auburn Mfg. v. Steiner Indus.*, 493 F. Supp. 2d 123, 129 n.3 (D. Me. 2007), Judge Singal described the *Zippo* test for Internet-based personal jurisdiction:

> The court in *Zippo* concluded that "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet."  The court then set out a sliding scale of web site interactivity to determine whether personal jurisdiction should be exercised.  On one end of the spectrum are defendants that

"clearly" conduct business over the Internet. . . .  At this end, personal jurisdiction is proper.  At the opposite end of the spectrum are defendants whose web sites are "passive," meaning that the "defendant has simply posted information on an Internet web site which is accessible to users in foreign jurisdictions."  In this situation, personal jurisdiction is not proper.  In the middle are defendants whose websites allow Internet users to interact with the web site by exchanging information.  Whether personal jurisdiction should be asserted over defendants falling into this middle ground, the court concluded, depends on "the level of interactivity and commercial nature of the exchange of information that occurs on the Website."

493 F. Supp. 2d at 129 n.3 (quoting *Zippo*, 952 F. Supp. at 1124).  Judge Singal noted that although instructive, "the Court is reluctant to adopt the *Zippo* test because it is not clear why a website's level of interactivity should necessarily be determinative on the issue of personal jurisdiction."  *Id.*  The *Auburn Mfg.* Court concluded that the defendant "'availed' itself of the Maine market by virtue of its catalog distribution" and the fact that "during the relevant time period a percentage—albeit a small percentage—of [defendant's] gross profits were derived from catalog and Internet sales in Maine."  *Id.* at 130.[14]

The Seventh Circuit discussed website-based personal jurisdiction in *uBID v. GoDaddy*, 623 F.3d 421 (7th Cir. 2010).[15]  The *uBID* court addressed whether

---

[14] One Maine state court has interpreted Maine's long-arm statute to create jurisdiction over internet-based transactions.  The Maine Superior Court in *Montalvo v. First Interstate Fin. Corp.*, 2005 WL 380727, at *3 (Me. Super. Ct. Jan. 3, 2005), responded to a defendant's argument that Maine jurisdiction would be unfair where "its Internet solicitations were directed broadly, that is, nationally and internationally, but were not 'purposefully' directed at Maine.  The Court held that "Internet advertising and sales are an example of precisely the sort of 'technological progress' creating an increased flow of commerce between Mainers and sellers in other states that was expressly the purpose of Maine's long arm statute.  14 M.R.S.A. § 704-A(1) (2003).  A business cannot escape liability for fraudulent transactions with Maine consumers simply by conducting its business on line."  *Id.*

[15] Recently other circuit courts have upheld the exercise of personal jurisdiction over out-of-state businesses based on the businesses' use of the Internet.  *See, e.g., Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010) (holding that the sale and shipment into New York of one

Illinois could exercise personal jurisdiction over GoDaddy, an Arizona company that registers domain names for customers.  GoDaddy's contacts with Illinois consisted of marketing and the sale of registrations for Internet domain names, as well as contracts with Illinois customers and the hosting of websites that are accessible from Illinois.  *Id.* at 424-25.  The Court analogized to national print distribution to find minimum contacts with Illinois sufficient to exercise specific, but not general, jurisdiction.  *Id.* at 427 ("Because of GoDaddy's extensive marketing in Illinois and sales to Illinois customers, . . . the Supreme Court's analysis of specific jurisdiction in *Keeton v. Hustler Magazine* . . . is most instructive here.").

In sustaining jurisdiction, the Court noted that "GoDaddy has thoroughly, deliberately, and successfully exploited the Illinois market. . . .  This is a company that, like the national magazine in *Keeton*, has conducted extensive national advertising and made significant national sales."  *Id.*  The Court, relying again on *Keeton*, dismissed GoDaddy's arguments that its ads "are only part[] of a national advertising campaign and that it does not target its advertising toward Illinois residents in particular."  *Id.* at 428.

"Consistent with the reasoning of *Keeton*, it is easy to infer that GoDaddy's national marketing campaign is intended to reach as large an audience as possible, including the 13 million potential customers in [Illinois]."  *Id.*  Although the Court expressed some "concern about adopting an overly expansive test of jurisdiction for internet-based commerce," it concluded that "[t]here is no unfairness in requiring

---

counterfeit handbag coupled with defendant's use of an interactive website to convey its products into New York and other states was sufficient to sustain jurisdiction).

GoDaddy to defend [a] lawsuit in the courts of the state where, through the very activity giving rise to the suit, it continues to gain so much." *Id.* at 432-33.

Even though the LSI website is not so interactive that it rises to the *Zippo* level of presumptively proper personal jurisdiction, it is more than a passive website containing information that is just accessible for viewing by users in other states. Under the *Zippo* test, the Defendants' website falls under the messier middle ground where personal jurisdiction depends on "the level of interactivity and commercial nature of the exchange of information that occurs on the website." The LSI website provides a form to schedule a free MRI review which may be submitted online, as well as online contact request forms that prompt return calls from the company. The website also boasts a section of patient testimonials "from across the U.S. and Canada" and a claim to have "already helped tens of thousands of patients." Taken as a whole, the purpose of the LSI website is commercial, not merely educational, in nature—to entice potential customers to contact the Defendants for laser back surgery in Florida. Therefore, a court agreeing with *Zippo's* analysis would probably uphold personal jurisdiction.

Because the District of Maine has not adopted the *Zippo* test, a broader look at the Defendants' use of the internet in their purposeful availment of Maine customers is appropriate. The Court notes that, like the defendant in *uBID v. GoDaddy*, the Defendants have conducted extensive national advertising and made significant national sales. The website campaign, like their national print marketing, is intended to reach a large national audience, including potential

customers in Maine.   LSI has successfully exploited at least part of the Maine market.

### iv.    Totality of contacts

"For purposes of the general jurisdiction analysis, [the First Circuit] consider[s] all of a defendant's contacts with the forum state." *Cossaboon*, 600 F.3d at 29*; see also New Life Brokerage*, 222 F. Supp. 2d at 107 ("the totality of contacts is sufficient to establish purposeful availment").   It makes sense then, in a specific jurisdiction analysis, for the Court to also consider all of the Defendants' contacts with the forum state that relate to the suit at hand.   The sum of these contacts weighs in favor of specific personal jurisdiction.   The Defendants' Maine contacts include: (1) the traditional contacts of phone, email, and faxed solicitations to Mr. Henderson; (2) the nationwide advertising placed in traditional magazines and far-flung in-flight catalogues; and (3) the semi-interactive website claiming to have helped "tens of thousands of people—from all 50 states."   Employing a factual analysis focused on the precise mix of contacts that characterize this case, the Court finds that the Defendants' contacts with the state of Maine constitute a purposeful availment of this forum.   Mr. Henderson has satisfied his prima facie burden.

### c.    Reasonableness

The existence of minimum contacts does not end the specific jurisdiction analysis.    "Personal jurisdiction may only be exercised if it comports with traditional notions of 'fair play and substantial justice.'"   *Nowak,* 94 F.3d at 717

(quoting *Int'l Shoe*, 326 U.S. at 320).  "Gauging fairness requires an assessment of reasonableness." *Harlow*, 432 F.3d at 67 (quoting *Ticketmaster*, 26 F.3d at 210).[16]

"To evaluate the reasonableness requirement, the Supreme Court has provided a set of 'gestalt factors' to consider." *Astro-Med*, 591 F.3d at 10 (citing *N. Laminate Sales*, 403 F.3d at 26).  These factors include:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Harlow,* 432 F.3d at 67 (citing *Burger King*, 471 U.S. at 477).  To prevail on this prong, the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 220 (1st Cir. 1989) (quoting *Burger King*, 471 U.S. at 477).

The Defendants protest that it "would be onerous for Defendants . . . to appear and defend this matter in Maine."  Yet, the First Circuit observed that "it is almost always inconvenient and costly for a party to litigate in a foreign jurisdiction." *Nowak,* 94 F.3d at 718 (citing *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994)).  Thus, "this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." *Pritzker*, 42 F.3d at 64.  The Defendants have

---

[16] *Ticketmaster* describes a sliding scale for the reasonableness prong of the due process inquiry. "[T]he weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction.  The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness." *Ticketmaster*, 26 F.3d at 210.

made no such showing of a special or unusual burden here.   Mr. Henderson, however, has demonstrated his own strong interest in obtaining convenient and effective relief in his home state.[17]   The first and third gestalt factors favor jurisdiction.

As to the second factor, the Defendants contend that Maine does not have an interest in adjudicating this dispute because all activities that support Plaintiff's claim occurred outside of Maine.   However, Mr. Henderson is a resident of Maine and the state "has an interest in providing its citizens a means of redress against nonresidents."   *McCain Foods Ltd. v. Lamb-Weston, Inc.*, No. 91-0066-B, 1992 WL 219010, at *1 (D. Me. May 5, 1992) (citing *Elec. Media Int'l v. Pioneer Commc'ns of Am., Inc.*, 586 A.2d 1256, 1259 (Me. 1991)); *see also Burger King*, 471 U.S. at 2182 ("A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors.").   Because Maine has such a manifest interest in protecting its citizens against out-of-state corporations, as codified in the wording of its long-arm statute, the Court determines that this factor favors jurisdiction.

Fourth, "nothing about this case suggests that [this Court] will have any difficulty rendering effective relief" if Mr. Henderson prevails on his claim.   *See Jet Wine & Spirits, Inc. v. Bacardi & Co., Ltd.*, 298 F.3d 1, 12 (1st Cir. 2002); *Adelson v.*

---

[17] "[T]his factor requires deference to a plaintiff's choice of forum." *Adelson*, 510 F.3d at 52 (citing *Foster-Miller*, 46 F.3d at 151; *Ticketmaster*, 26 F.3d at 211).   Mr. Henderson has further demonstrated his interest in obtaining relief in the courts in Maine by maintaining before the Court that he "is an individual who is unable to easily travel -- since February 2009 he has not been able to endure any flight of more than one and a half hours." *Pl.'s Opp'n* at 9.

*Hananel*, No. 09-2231, --- F.3d ----, 2011 WL 2698330, at *6 (1st Cir. July 13, 2011). Fifth and finally, although Florida also has a significant interest in the medical procedures performed within its borders, the Court sees no evidence that exercising jurisdiction in Maine would offend due process or be contrary to traditional notions of fair play and substantial justice. "Besides, given the relatedness and purposeful availment demonstrated here, the weight of this one factor within 'reasonableness' is slight." *Adelson*, 2011 WL 2698330, at *5.

On balance, the gestalt factors point to jurisdiction in the District of Maine being reasonable. Personal jurisdiction over the Defendants is proper.[18]

**B.    Venue**

**1.    Determining proper venue**

The Defendants argue for dismissal of Mr. Henderson's Complaint on the grounds that venue is not proper in the District of Maine. Title 28 of the United States Code, § 1391(a) governs venue in civil actions, such as this one, where jurisdiction is founded only on diversity of citizenship. 28 U.S.C. § 1391(a). It provides that a civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." *Id.* § 1391(a)(2).

---

[18] The Court is mindful that it must determine separately potential jurisdiction for each defendant and each count of the complaint. *See N. Am. Catholic*, 567 F.3d at 12. However, the issue of whether there is a justifiable distinction between Dr. Prada's contacts with Maine and those of his employer LSI for purposes of specific personal jurisdiction has not been adequately presented. The Court does not reach the question.

The First Circuit has said that in determining whether a forum "is a district in which a substantial part of the events occurred, [the court should] look 'not to a single triggering event' prompting the action, but to the entire sequence of events underlying the claim." *Astro-Med*, 591 F.3d at 12 (quoting *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir. 2001)).  Not only does the First Circuit endorse this "holistic view of the acts underlying a claim," but it stresses that the court is "not required to determine the best venue, merely a proper venue." *Id.*; *see also Uffner*, 244 F.3d at 43 ("[T]he general purpose of statutorily specified venue [is] 'to protect the defendant against the risk that a plaintiff will select an unfair or inconvenient place of trial.'" (quoting *Leroy v. Great W. United Corp.*, 443 U.S. 173, 183-84 (1979))).

Here, most of the wrongful acts claimed by Mr. Henderson took place, at least in part, in Maine.  Looking to the entire sequence of events underlying his claim, many of the claims arise out of the Defendants' contact with Mr. Henderson in Maine—fraud, unfair trade practices, fraudulent concealment, and negligent misrepresentation, as well as breach of the part of the contract that promised the Defendants would take all reasonable actions necessary to ensure insurance coverage.  Given that a substantial part of Mr. Henderson's claims took place in this state, the Court retains venue in the District of Maine.[19]

---

[19] Plaintiff maintains that venue would be proper in Maine under 28 U.S.C. § 1391(a)(3) because Maine would qualify as "a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced." *Pl.'s Opp'n* at 15.  This neglects the statutory words that follow: "if there is no district in which the action may otherwise be brought." 28 U.S.C. § 1391(a)(3). The Court need "turn to the third alternative only in the event that the first two provisions fail to provide an appropriate forum." *Allen v. Am. Fed'n of Gov't Empls. AFL-CIO*, 198 Fed. Appx. 16, at

### 2.      Transfer of venue

Even if venue is proper in the District of Maine, the Defendants request that the Court transfer venue to the appropriate district in Florida.  The change of venue statute, 28 U.S.C. § 1404, provides, in part: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).  "The burden of proving the propriety of a transfer lies with the party seeking it," *Johnson v. VCG Holding Corp.*, 767 F. Supp. 2d 208, 212 (D. Me. 2011) (citing *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir. 2000)), and "there is a strong presumption in favor of a plaintiff's choice of forum." *Astro-Med*, 591 F.3d at 13.

After considering the plaintiff's choice of forum and the convenience of parties and witnesses, "the factors to be considered by the court include the availability of documents; the possibility of consolidation; and the order in which the district court obtained jurisdiction." *Coady*, 223 F.3d at 11.  Beyond that, the court has discretion.  *See Demont & Assocs. v. Berry*, 77 F. Supp. 2d 171, 173 (D. Me. 1999) ("Wisely it has not been attempted to catalogue the circumstances which will justify or require grant or denial of transfer.  Given the statutory standards the decision is left to the sound discretion of the trial judge." (quoting 15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 3847, at 368 (2d ed. 1986))).

---

*1 (1st Cir. 2006) (citing *Uffner*, 244 F.3d at 42).  The Court is not presented here with a situation where venue would not otherwise be proper in another judicial district.

44

The Court has noted that it is almost always inconvenient for one of the parties to travel to an out-of-state forum for litigation. One side has witnesses in Maine; the other side's are likely in Florida. The Defendants have failed to make the requisite showing of inconvenience to themselves or their witnesses to overcome the strong presumption in favor of Mr. Henderson's choice of forum. The motion to transfer venue is denied.

### C. Statutory Arguments

#### 1. Application of Florida Statute § 95.11

The Defendants are not done. They argue that Mr. Henderson's claims are barred because he failed "to comply with Florida statutes governing medical malpractice actions."

Federal jurisdiction in this case is premised on diversity of citizenship so the Court applies state substantive law. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Maine's choice of law rules thus apply.[20] *See Walker v. Unum Life Ins. Co. of Am.*, 530 F. Supp. 2d 351, 353 (D. Me. 2008) ("A federal court sitting in diversity must apply the conflict of law rules of the state in which it sits, in this case, Maine.") (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *LaPlante v. Am. Honda Motor Co.*, 27 F.3d 731, 741 (1st Cir. 1994)). Maine has

---

[20] The Court entertains the choice-of-law question because there is an actual "conflict between the substantive laws" of Maine and Florida. *Prime Tanning Co., Inc. v. Liberty Mut. Ins. Co.*, 750 F. Supp. 2d 198, 210 (D. Me. 2010) (quoting *Millipore Corp. v. Travelers Indem.Co.*, 115 F.3d 21, 29 (1st Cir. 1997)). "There is no conflict when the resolution of a choice-of-law determination would not alter the disposition of a legal question." *Id.* (quoting *Okmyansky v. Herbalife Int'l of Am., Inc.*, 415 F.3d 154, 158 (1st Cir. 2005)). Here, Plaintiff's claims for damages would be barred by Florida's two-year statute of limitations, but allowed to go forward under Maine's six-year limitations period. Because resolution of this determination would vary the result of the case, the Court undertakes the choice-of-law analysis.

adopted the traditional approach of the Restatement (Second) of Conflict of Laws so that "the statute of limitations of the forum controls, even if the substantive law of another state applies." *Siegemund*, 247 F. Supp. 2d at 6.

The Defendants believe that this case falls within an exception to the rule that Maine's own statute of limitations applies. "There are two exceptions to this rule: (1) where Maine's borrowing statute applies;[21] and (2) where the claim is predicated on a foreign statutory enactment." *Siegemund*, 247 F. Supp. 2d at 6 (quoting *Johanson v. Dunnington*, 785 A.2d 1244, 1246 (Me. 2001)). The Defendants contend that the foreign enactment exception is applicable here. The Court disagrees.

The foreign statutory enactment exception would permit application of Florida's statute of limitations only if a Florida statute created the present cause of action. *See Tornesello v. Tisdale*, 948 A.2d 1244, 1250 (Me. 2008) (citing *Johanson*, 785 A.2d at 1246; *Hossler v. Barry*, 403 A.2d 762, 765 (Me. 1979)). Florida statutory law did not create the right sought to be enforced here. Mr. Henderson's "suit is not predicated upon a foreign statutory enactment without which no action could be maintained"; all of his claims "rest upon common-law principles" of tort, contract, and Maine law. *See id.* (citing *Hossler*, 403 A.2d at 765; *Johanson*, 785 A.2d at

---

[21] Maine's borrowing statute was enacted to prevent forum shopping. 14 M.R.S. § 866. It allows Maine "to borrow and use the statute of limitations of another state in determining the timeliness of an action," but only applies where "the parties [] reside in the same state at the same time." *Siegemund*, 247 F. Supp. 2d at 6 (quoting *Hossler*, 403 A.2d at 765). Because the Defendants have resided in Florida for all periods at issue, this exception does not apply.

1246).   Because the suit is predicated upon the common law and not on Florida statutory law,[22] Maine's statute of limitations applies.

## 2.   Application of the Maine Health Security Act

The remaining statute of limitations question concerns whether the MHSA applies,[23] and if so, whether Mr. Henderson has complied with it.

The MHSA mandates that before a plaintiff may file suit against a medical provider, the plaintiff must present the claim to a duly authorized pre-litigation screening panel and receive a decision.  *Kidder v. Richmond Area Health Ctr., Inc.*, 595 F. Supp. 2d 139, 142-43 (D. Me. 2009) (citing 24 M.R.S. §§ 2853(1), 2903(1));  *see also Daigle v. Maine Med. Ctr., Inc.*, 14 F.3d 684, 687 (1st Cir. 1994) ("By its terms, the Act requires parties to submit medical malpractice claims to a prelitigation screening panel as a condition precedent to court access, unless both sides agree to bypass the panel hearing.").   Failure to file the requisite pre-litigation notice "constitutes a bar to a civil action under the MHSA."  *Kidder*, 595 F. Supp. 2d at 143.

However, the MHSA's "mandatory provisions . . . apply only to actions for professional negligence."  *Brown v. Augusta School Dept.*, 963 F. Supp. 39, 40 (D.

---

[22] The Florida law upon which the Defendants base their statutory enactment argument details limitations on various types of actions.   *See* Fla. Stat. § 95.11(4)(b) ("An action for medical malpractice shall be commenced within two years from the time the incident giving rise to the action occurred . . . .").   To permit another state's statute of limitations to serve as a foreign statutory enactment would turn almost any common law action into a foreign statutory enactment for purposes of Maine choice of law.

[23] "[T]he District of Maine has held that the MHSA applies to medical malpractice claims filed in federal court on the basis of diversity."  *Hewett v. Inland Hosp.*, 39 F. Supp. 2d 84, 87 (D. Me. 1999) (concluding that the court was "precluded from hearing Plaintiff's malpractice claims by the present version of the MHSA which requires submission of claims to a pre-litigation screening panel as well as pre-litigation notice").

Me. 1997).  Under the MHSA, an "action for professional negligence" is "any action for damages for injury or death against any health care provider . . . or health care practitioner, . . . whether based upon tort or breach of contract or otherwise, arising out of the provision or failure to provide health care services."  24 M.R.S. § 2502(6).[24]  Maine courts have interpreted this provision of the MHSA broadly, applying the MHSA "to *all* actions for professional negligence against a health care provider or practitioner."  *Saunders v. Tisher*, 2006 ME 94, ¶ 12, 902 A.2d 830, 833 (emphasis in original).

"Professional negligence within the meaning of the MHSA is also defined very broadly."  *Id.*  The Maine Law Court has read the "or otherwise" language as "reflect[ing] a legislative intent that the MHSA 'occupy the field with regard to actions against health care providers.'"  *Id.*  (quoting *Musk v. Nelson*, 647 A.2d 1198, 1201 (Me. 1994)).  "[T]he Legislature essentially made the MHSA applicable to any case that could implicate medical malpractice insurance."  *Id.*  The Law Court has thus "found the [M]HSA's procedural requirements and limitations period to be applicable in a wide variety of contexts."  *Butler v. Killoran*, 714 A.2d 129, 132 (Me. 1998).[25]

---

[24] Mr. Henderson points out that the MHSA definition of "health care provider" includes only those facilities that are somehow licensed in the state of Maine.  That is true, but LSI is nonetheless covered by the MHSA because the term "health care practitioner" does not contain such a limiter.
[25] *See, e.g.*, *Brand v. Seider*, 697 A.2d 846 (Me. 1997) (patient's claim against psychologist for breach of confidentiality is subject to MHSA's procedural requirements); *Dutil v. Burns*, 674 A.2d 910 (Me. 1996) (strict liability and breach of warranty claims brought against health care providers are subject to the MHSA's procedural requirements and limitations period); *Musk,* 647 A.2d 1198 (claim for failed sterilization is subject to MHSA's limitations period); *Thayer v. Jackson Brook Inst.,* 584 A.2d 653 (Me. 1991) (claim brought by plaintiff who was attacked while visiting patient care facility is subject to MHSA's limitations period); *Olszewski v. Mayo Regional Hosp.,* 2008 WL 5191734 (D.

48

Under this broad reading, the MHSA governs all of Mr. Henderson's claims given that they are related to the medical treatment provided by the Defendants and could implicate medical malpractice insurance.[26]   Count I (fraudulent representations that the recommended treatments were effective and medically accepted and covered by insurance), Count II (breach of a contract to provide medically accepted treatment), Count III (unjust enrichment based on LSI's retention of money paid for medical treatments), Count VI (negligent misrepresentation supplied to guide Mr. Henderson's choice of medical treatment), Count V (fraudulent concealment based on LSI's knowledge of its treatments being neither effective nor medically accepted), Count VII (negligence)[27], and Counts VIII and IX (intentional and negligent infliction of emotional distress suffered by Mr. Henderson as a result of LSI's conduct) are all actions of professional negligence brought against a healthcare provider or practitioner.

Whether Count IV—the allegation of unfair trade practices pursuant to 5 M.R.S. § 213—falls within the MHSA is less clear.   Nevertheless, because Mr. Henderson is likely to pursue his other claims before the MHSA designated panel,

---

Me. 2008) (claims for assault, intentional and negligent infliction of emotional distress, breach of fiduciary duty, and negligent supervision); *cf. Dupuis v. Cancer Screening Servs.*, No. 96-169-P-C, 1997 U.S. Dist. LEXIS 2456, at *12 (D. Me. Feb. 13, 1997) (defendant laboratory had no contact with patients and its evaluation and reporting of tissue sample results were not medical services so MHSA did not apply).

[26] Mr. Henderson has requested that "[t]o the extent that the Maine Health Security Act is deemed to apply to Dr. Prada, Mr. Henderson withdraws Count VII ("Negligence") against him, which is the only count that could trigger the statute." *Pl.'s Opp'n* at 19.  The Court finds that Dr. Prada is within the statute's definition of health care practitioner; the MHSA would apply to Mr. Henderson's action for professional negligence against him.  In accordance with Mr. Henderson's request, the Court dismisses Count VII against Dr. Prada.

[27] Count VII now applies to LSI only as Mr. Henderson has withdrawn the claim of negligence against Dr. Prada.

the Court will not reach whether Count IV would be included as an action of professional negligence. There is no evidence that Mr. Henderson complied with the MHSA's notice and screening provisions for these professional negligence claims.

The Court turns to the question of remedy. A defense of failure to comply with the notice and screening provisions of the MHSA is analogous to a defense predicated on insufficient service of process or lack of subject matter jurisdiction. *Demmons v. Tritch*, No. 06-140-B-W, 2007 WL 777541, at *4 (D. Me. Mar. 1, 2007) (citing *Dutil v. Burns*, 687 A.2d 639, 641 (Me. 1997)). As explained by the Law Court, "[d]ismissal is not required by the statute so long as an action is commenced before the expiration of the statute of limitations." *Brand*, 697 A.2d at 848 (holding that the lower court erred in denying plaintiff's request for a stay of the court proceedings that would permit her to serve the written notice of claim required by the MHSA).

The Court concludes that Mr. Henderson must submit his claims to a pre-litigation screening panel in compliance with the MHSA before bringing suit in this Court. *See Hewett v. Inland Hosp.*, 39 F. Supp. 2d 84, 88 (D. Me. 1999). The Court further concludes that it may exercise personal jurisdiction over the Defendants, that venue is proper in the District of Maine, and that the cited Florida statutes do not apply. However, Mr. Henderson has failed to comply with the mandatory provisions of the MHSA. Following the Law Court's lead in *Brand*, the Court denies LSI's motion to dismiss and stays this action to allow Mr. Henderson to complete the mandatory pre-litigation screening under the MHSA. The Court will require a

report from Plaintiff's counsel every six months as to the status of the pre-litigation screening process and upon completion of that process will schedule a conference of counsel to resolve future proceedings in this Court.

## IV.   CONCLUSION

The Court DENIES Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and for Change of Venue, or in the Alternative to Dismiss for Failure to Comply with Florida Medical Malpractice Statutes or Maine Health Security Act, except it DISMISSES without prejudice the Defendants' Motion to Dismiss for failure to comply with the Maine Health Security Act (Docket # 15). The Court STAYS further proceedings in this case until the parties complete mandatory pre-litigation screening under the Maine Health Security Act.  The Court ORDERS the Plaintiff to file a report regarding the status of the pre-litigation screening process with the Court every six months from today's date.  If the Plaintiff fails to initiate a pre-litigation screening on a timely basis, the case will be subject to dismissal.  The Court dismisses Count VII against Defendant Stefan Prada.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 28th day of September, 2011